WILLIAMS, Judge.
Plaintiff, Terrebonne Towing, Inc., brought suit against defendant, Austral Oil Co., to collect $11,212.50 on invoice No. *1157 1330, dated January 27, 1983, for the services rendered by the tugboat “Kim C” January 4 through January 6 and January 9 through January 24, 1983. The trial judge concluded that the Kim C’s towing services for the period recited on invoice No. 1330 were rendered at the request and for the benefit of Sanders Drilling Co., Inc., a non-party to this action. As the court below found Sanders Drilling Co. solely liable for the services and charges of the Kim C, judgment was rendered in favor of defendant Austral Oil and the suit was dismissed at plaintiff’s cost. Plaintiff now appeals asserting the trial court manifestly erred in its conclusions as to the credibility of the witnesses and the findings of fact. We affirm; the record of the court below reasonably supports the findings of the trier of fact so as to establish that the judgment is not clearly wrong.
FACTS
The evidence presented at trial revealed that during December, 1982 and January, 1983 the defendant, Austral Oil, was the operator of an oil well which was being drilled in Lost Lake Field, Terrebonne Parish. Austral Oil had employed Sanders Drilling Co., under a written contract, as the drilling contractor for the well. Their contract designated the items which Sanders was to furnish and Sanders was compensated accordingly. One contractural provision obligated Sanders to furnish a “Marine Package” comprised of a service tug, two crewboats and a flatbed barge.
In accordance with the terms of this “Marine Package”, Sanders furnished the J. J. Duncan as the service tug. Austral became dissatisfied with the services of the J. J. Duncan, however, so that on or about January 4, 1983, Austral requested that Sanders provide the services of a more powerful tugboat. After Austral agreed to compensate Sanders $150.00 a day in addition to their previously agreed upon drilling contract price, in order to cover the cost of the rental of a more powerful tug, Sanders contacted Terrebonne Towing, Inc., the entity which owned the tug the Kim C, and arranged her services in substitution for those of the J. J. Duncan.
Soon thereafter, on January 10, 1983, Sanders filed Chapter 11 bankruptcy. And due to Sanders financial difficulties, Terre-bonne Towing, Inc., through its owner and Vice-President, Anthony Carrere, Jr., telephoned Austral to request that it be permitted to invoice Austral directly for the services of the Kim C. Carrere spoke with I. R. Chalmers, the independent consultant hired by Austral as the full service agent for the drilling of the well.[1] At trial, Carr-ere who was the plaintiff’s sole witness, testified that Chalmers guaranteed Austral would pay the invoice for the rental of the Kim C. Chalmers’ testimony, however, directly contradicted this evidence as he testified he refused Carrere’s request to bypass Sanders and be billed directly for the services of the Kim C, because of the contract Austral had with Sanders.
Terrebonne Towing did not bill Sanders for the services of the Kim C; instead, it sent the bill directly to Austral. Sanders also invoiced Austral for the services of the Kim C and, based upon its initial contract with Sanders and its agreement to pay the additional $150.00 a day compensation to-talling $2,850.00, Austral promptly paid Sanders or Sanders’ bankruptcy trustee for the services rendered by the Kim C.
After hearing this evidence, the trial judge found there was never a contract between Terrebonne Towing and Austral for the towing services of the Kim C. Rather, Terrebonne Towing rendered their services at the request of and for the benefit of Sanders. Additionally, the court found that the invoice sued upon, No. 1330, dated January 27, 1983, recited an obligation of Sanders and that company is solely liable for the charges plaintiff is seeking to collect through this suit.
On appeal, Terrebonne Towing claims the trial judge manifestly erred in its conclusions as to the credibility of the witnesses and the findings of fact. Terrebonne Towing claims it is unreasonable to conclude that a) it would continue to provide the *1158 services of the Kim C after Chalmers allegedly refused to pay for her services directly to Terrebonne Towing; b) Austral did not contract directly with Terrebonne Towing for the services of the Kim C because in the past Austral had contracted directly with Terrebonne Towing for the Kim C’s services and had contracted directly with Terrebonne Towing and its sister operation, Terrebonne Fuel, Inc., for numerous other services; and c) Chalmers had not agreed to pay Terrebonne Towing directly because, as he was a paid consultant, he would be willing to guarantee payment of the invoice just to keep the Kim C working.
To prove Austral’s obligation to pay for the services of the Kim C rendered January 4 through January 6 and January 9 through January 24,1983, as recited on the invoice No. 1330, plaintiff's evidence at trial began with the introduction into evidence of two invoices, unrelated to this matter, which plaintiff had sent to Austral and which Austral had paid. One of the invoices was for the services of the Kim C on January 1 through 2, 1983 and the other invoice was for the rental of a flatdeck barge for January 1 through 3, 1983. Ter-rebonne Towing also introduced other invoices which Austral had paid, representing services and supplies that had been ordered directly by Austral from Terre-bonne Towing or her sister operation, Ter-rebonne Fuel.
The invoices and testimony indicated that after Austral received these invoices, Chal-mers would approve the invoices and Austral’s Houston office would promptly pay them. Apparently, Terrebonne Towing introduced this evidence to show that because Austral had dealt directly with Terre-bonne Towing and Terrebonne Fuel on other occasions, Austral dealt directly with Terrebonne Towing on the occasion evidenced by invoice No. 1330. We are not persuaded. This evidence only lends support to the trial court’s conclusion that no contract existed between Austral and Ter-rebonne Towing on this occasion. The evidence demonstrated that when Austral ordered services or supplies from plaintiff, Austral paid the invoices promptly; the disputed invoice being the exception. Instead of paying Terrebonne Towing promptly for the recited services of the Kim C, Austral paid Sanders promptly.
The remainder of plaintiff’s evidence consisted of Carrere’s testimony about the Kim C’s tug log, which indicated the tug worked for Austral on the days recited in invoice No. 1330. And Carrere’s personal daily docket for January 12, 1983, which indicated that on that date he spoke with Chalmers about billing Austral directly for the services of the Kim C. Carrere testified it was during that conversation when Chalmers allegedly agreed to guarantee direct payment to Terrebonne Towing.
Austral’s evidence was to the point and contradicted Terrebonne Towing’s case. Paul Cole, Austral’s former president who had been chief accountant in January, 1983, testified about Austral’s Houston office’s practice of paying its bills. Statements received concerning the drilling of the Lost Lake Field well were sent to Chalmers for approval, and when approved, the Houston office paid them promptly. Cole also testified that Austral received a supplemental invoice from Sanders, representing the $150.00 a day charge for the substitution of the Kim C for the J. J. Duncan and the invoice was promptly paid.
Austral’s second witness, Chalmers, testified concerning Sanders’ obligation to furnish the “Marine Package”, which included the service tug. He testified he had been dissatisfied with the lack of horsepower of the J. J. Duncan, the tug which Sanders originally delivered. At his request, Sanders substituted the services of the Kim C. for those of the J. J. Duncan. Chalmers had known the Kim C could adequately perform the job because Chalmers had used her services on prior occasions. He agreed to the supplemental charge that Sanders had requested for the substitution and he approved Sanders’ invoice for the supplemental fee of $2,850.00. Chalmers also testified that the June 5, 1983 daily drilling report indicated he had agreed to pay $150.00 per day extra to the contractor for the increase of horsepower by the tug.
*1159 Concerning his conversations with Terre-bonne Towing about direct payment to it for the Kim C’s services, Chalmers testified about two or three phone calls he had with Carrere and a Mr. Talbert:
“... Their purpose was, they were trying to get us to pay them direct for things because they knew Sanders was probably having trouble and on these occasions they tried to rebill and billed us for things they should be billing Sanders. I told them, it couldn’t be done. Our contract was with Sanders and that’s the way it was going to be. We paid everything we felt I could justify paying them on these extra services but Sanders had to give us a service tug there at all times.” (trial transcript, pp. 36-37.)
Austral’s concluding witness, Fitz Pharr, testified about the date the J. J. Duncan was substituted for the Kim C. He was present when Sanders’ tool pusher, Tony Vallois, telephoned Terrebonne Towing and asked Terrbeonne to furnish the services of the Kim C.
As the foregoing review of the trial record establishes a reasonable factual basis for the findings of the trier of fact and also establishes that the findings are not clearly wrong, Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978), the judgment of the court below is affirmed, all at the plaintiff’s costs.
AFFIRMED.

. At the time of this transaction, Chalmers was an independent consultant. However, prior to beginning his consulting firm, he had worked for Austral for 25 years.