I «MARION F. EDWARDS, Judge.
Appellant, Pearl River Navigation Company (“Pearl”), appeals a judgment of the district court in favor of appellee, Bell Marine Services Inc. (“Bell”), in the amount of $15,806.25. We affirm.
Bell filed suit in open account against Traver Oil Company Inc. (“Traver”), Pearl and Allen L. Warriner, the owner of Pearl. The petition alleged that from December 15,1998 through December 21, 1998, and January 5, 1999, through January 8, 1999, Bell was engaged by Pearl and/or Warri-ner to perform tugboat towing and other services on a production platform operated by Traver. According to the pleading, Pearl represented that Traver would pay for the services rendered and requested that Bell invoice Traver directly. Demand was made for the sum of $15,806.25. The petition urged that Pearl and/or Warriner misrepresented Traver’s responsibility for payment, and these actions also constituted a breach of contract by both Pearl and Traver.
Prior to trial on the merits, Warriner was dismissed from the proceedings. Following trial, the trial court ruled in favor of Bell and against Pearl in the amount | ^prayed for, plus attorney fees, costs, and interest from the date of demand. Pearl appeals.
At trial, Kelly Bell, who was part-owner along with her husband of the now-defunct Bell Marine, testified that Allen Warriner of Pearl River Navigation hired the company for the job in question. Although she did not speak with Warriner personally, she was present during telephone calls between him and her husband. The total of the first invoice, dated December 15-21, 1998, was for $11,615.00. An undated, handwritten notation on that invoice states: “Bill directly to Traver Oil & pay Allen $10.00 commission.” Initially, Bell intended to bill Pearl, as they had done in the past. However, after the job began, Warriner told Bell it “might have better luck” if Traver were directly billed, but copies of the invoices were to be sent to him (Warriner). Mrs. Bell sent a second invoice to Traver for $13,165.00, for the same period of time and units of work. The difference in the two amounts was explained by Mrs. Bell as a type of commission to Warriner. A third invoice for services from January 5-8, 1999, and dated January 8, 1999 in the amount of $7,641.25 was also introduced into evidence. Normally, only one invoice would have been generated, but after the first phase, Bell returned to work at Warriner’s request.
Pearl made a partial payment of $5,000.00 on the Traver account, and Bell sent Pearl a check representing Warriner’s *1062 commission on that sum. Other invoices, involving other jobs, were introduced at trial. These invoices evidenced that when Bell did a job for Pearl, Pearl was billed and paid the invoices. On one other occasion, Warriner requested that Bell forward an invoice for a customer to Pearl, to be included in Pearl’s invoice to its client. This invoice was never sent to Pearl’s client directly, and Warriner paid that particular job. Mrs. Bell was not aware of any occasions on which Bell billed customers in lieu of billing Pearl directly.
|4In the present matter, demand notices were sent to both Pearl and .Travers. On direct questioning by the Court, Mrs. Bell was emphatic that Bell was hired by War-riner and Pearl River, and that Bell did not speak with Traver until midway through the job.
Mr. Bell testified that Warriner discussed the job with him, informing him of some of the details. Warriner had previously acted as a broker for Bell on occasion, when Bell would directly bill the other company and pay Warriner a commission; this commission work was customary in the industry.
“Whenever I was working for him we were always working for somebody else. Very seldom did I do work directly for Allen. It was always part of a package. I work for Allen and he had a contract with somebody to do a certain job.”
On this particular job, Bell would operate a crane owned by Pearl, along with a barge with other equipment on it. Pearl was providing a service to Traver, setting and holding coil tubing, and hired Bell’s boat to push the barge. At that time, there was no discussion as to who would pay the bill. Warriner did not tell him that Traver would pay the bill, or that Traver was having financial difficulties. Pearl did not direct the day-to-day operations, although Bell would call Warriner if there were problems with the equipment. Traver, or other companies on the job working for Traver, usually directed Bell.
At one point, the weather became an issue and Bell consulted with a representative of Traver about pulling out. Finally, Bell determined that it was unsafe to continue, and called Warriner to inform him the job was going to be shut down. After the first work period in December, Bell became concerned because he discovered that other contractors on the job had been pre-paid. Warriner told Bell that there was a better chance of getting paid sooner if Traver were billed directly, because Traver already owed Warriner money.
|fiAt some point, during the second phase of the job, he told Traver that he did not work for Pearl, and would be billing Traver directly. However, Bell testified that he was never a direct employee of any of the companies on this job, but was rather a contractor.
A letter of demand from Bell to Pearl in the amount of $15,806.25 was introduced into evidence.
Warriner testified that Traver contacted his company about providing a tug and a barge, and a crane barge to carry coil tubing to a job in Lake Ponchartrain. In the first phase, Pearl used its own boat, but later did not have a tug available. At that point, Warriner contacted Bell to do the towing. At the beginning, Warriner told Bell that it would be better to bill Traver directly, because Bells’ rate was higher than Pearl’s. Warriner was working for $100.00 per hour, and Bell’s boat, including a commission to Pearl, was $145.00 per hour. Nobody at Traver hired Bell, who would not have been on the job except for Pearl’s request. Warriner knew before hiring Bell that Traver had been slow in paying bills. Pearl was not paid for the Traver job, and did not bill Traver for any of the work done by Bell.
Warriner had brokered jobs for Bell before, with other companies, for which he *1063 was paid a commission. After completion of the Traver job, Pearl gave Bell Marine a check for $5000.00, and was “helping out” Bell, which was short on capital, by advancing funds before either was paid for the Traver job. Bell would repay when they were paid directly by Traver. Warri-ner never discussed anything with Mrs. Bell, and did not discuss the matter in detail with Mr. Bell: “He just needed some money.” He never asked Bell to repay the loan, but rather: “I trust that he will if he ever gets paid on this job.” The check, introduced into evidence, has only the notation “Traver Acct.” Warriner had previously advanced Bell money on invoices before they were paid, “like a loan on receivables.” Pearl did | finot direct the day-to-day operations on the Traver job, and had told Bell to do whatever they need done, to “work with the customer.”
The court found that Bell was hired by Warriner to do a job that his company could not perform, and that he was hired by Pearl to move its barge. The court determined that Bell was a subcontractor of Pearl. On appeal, Pearl urges that the trial court erred as a matter of law in concluding that it was responsible for the work conducted by Bell. Pearl urges that it acted as a broker between Bell and Traver, in return for which Bell paid Pearl a small commission consistent with their pri- or practice.
It appears from the evidence that the relationship between Bell and Peari/Warri-ner was irregular, or inconsistent. At times, Warriner acted as an agent/broker and at other times, as a general contractor. On the evidence before us, we cannot say that the trial court was clearly wrong in characterizing the association in the present instance to be one of contractor/subcontractor.
All parties agree that Traver contracted with Pearl to provide a tug and barges for Traver Oil. When Pearl’s tug became unavailable, Warriner contacted Bell to provide the boat and services. The initial invoice was billed to Pearl. Both of the Bells testified that they were told to bill Traver directly only after completing the first phase of the job. Mr. and Mrs. Bell emphasized that the $5000.00 check from Pearl was a partial payment for the Traver job. The check itself denotes it is for the “Traver Acct”, and the amount demanded by Bell is the total of the two invoices minus five thousand dollars. We conclude that the check was, indeed, a partial payment by Pearl for sums due to Bell, rather than a loan or advance. Pearl cites a Fourth Circuit case in support of its position that as a broker, it was not obligated to pay Bell.[1] In that case, the defendant Austral contracted with Sanders, a non-party, to provide a marine package. Unsatisfied |7with the tug Sanders supplied, Austral requested Sanders to supply a more powerful tugboat and agreed to compensate the difference in cost. Sanders contacted Terrebonne, which provided the tug. After Sanders filed for bankruptcy, Terrebonne requested Austral for permission to bill them directly, which Austral refused. Nonetheless, Terrebonne did directly bill Austral. Sanders also billed Austral, and based on its contract, Austral paid Sanders. The court found there was no contract between Terrebonne and Austral, and determined that Terrebonne rendered its services at the request of and for the benefit of Sanders. The invoice sued upon was an obligation of Sanders, which was solely responsible.
We do not find Terrebonne applicable, and it is distinguishable on its facts. In the present case, Pearl contracted with *1064 Traver to supply, among other things, a tugboat, and later arranged with Bell to replace an unavailable tug, in order to complete its agreement. Although it appears that Bell and Warriner enjoyed an ambiguous arrangement, Warriner’s suggestion of convenience, that Bell bill Traver directly, does not change the nature of Bell’s relationship with Pearl. We find no manifest error in the judgment of the trial court that Bell acted as a sub-contractor.
Pearl also argues that the court erred in assessing the full value of the invoices plus attorney fees and costs when Bell contracted directly with Traver for additional services and included these charges as part of its demand against Pearl. However, Pearl did not produce any evidence supporting its claim that Traver contracted directly with Bell. This assignment of error is without merit.
For the foregoing reasons, the judgment is affirmed. Costs are taxed to appellant.
AFFIRMED.

. Terrebonne Fuel & Lube, Inc. v. Austral Oil Co. Inc., 531 So.2d 1156 (La.App. 4th Cir. 1988).